## The Michigan Central Railroad Company v. William H. Edwards.

*Railroads : Freight: Contracts: Evidence.* An action to recover back six dollars per car load for freight paid under protest at the rate of twenty-two dollars per car for lumber transported by a railroad company, based on an alleged contract that, in consideration that plaintiff would build a mill and cause the pine timber on his lands near by to be sawed thereat and furnish the lumber to the company for transportation, the company would carry the same for sixteen dollars per car, will fail in the absence of evidence that such an undertaking binding upon the company was in fact made; and the evidence in this case is held to have come short of proving any such promise on behalf of the company.

*Heard October 14. Decided November 2.*

Error to Saginaw Circuit.

*Gaylord & Hanchett* and *G. V. N. Lothrop*, for plaintiff in error.

*John J. Wheeler*, for defendant in error.

GRAVES, CH. J:

The defendant in error sued in general assumpsit to recover back what he claimed to be excessive charges paid under protest for transporting lumber. He recovered a verdict, and the company brought error. The objections are presented in a bill of exceptions, which contains all the evidence and the judge's charge. The transaction in controversy arose in connection with the Jackson, Lansing & Saginaw Railroad, operated by the plaintiffs in error, and by them called the Saginaw division of the Michigan Central Railroad. The case can be better understood by adverting to a few circumstances as epitomized in the brief of defendant in error.

In 1872 Edwards owned three hundred and sixty acres of pine land, estimated to contain from ten to twelve million feet of pine timber, situated about forty-three miles northerly from Bay City, on the line of the Jackson, Lansing & Saginaw Railroad.

One George W. Hotchkiss wanted to build and place a mill to cut this timber, but had no money. He proposed to Edwards to build a mill on this land, the latter to supply the money and get his pay with interest through the sawing. The land was then the extreme limit of the railroad; all was a wilderness; no settlements or inhabitants beyond, nor for miles southerly. There was no way to get the logs or lumber to market except by the railroad. It is proper to mention that at this time one Sanborn was interested with Edwards, but not long after his interest was vested in the latter. In view of the arrangement then contemplated with Hotchkiss, or rather in view of the expediency of going into such an arrangement, these persons con-

versed with Mr. Watson, the division superintendent, and Mr. Northrup, the division freight agent, in regard to rates for freighting lumber, and railroad accommodations for carrying forward the suggested project. Certain letters also passed, of which four were put in evidence. Only three of them are material in this inquiry.* One of April 5, 1872, was addressed by Northrup to Edwards and Sanborn; one by Hotchkiss, of May 2d, to Northrup; and the third, of May 4th, by Northrup, in reply to this last. The theory of Edwards' ground of action is stated by his counsel as follows: The theory of the plaintiff below was, that in consideration that Edwards would build a mill, or furnish the money therefor, and cause the lumber to be sawed thereat,

---

* JACKSON, April 5, 1872.

GENTLEMEN:—By request of Mr. Watson, allow me to say, the rate on lumber car loads from a point not exceeding forty-five miles north of Wenona to Wenona will be sixteen dollars. From said point to Saginaw, say sixty miles, twenty dollars.

On through business, or business consigned to points east of Detroit or south of Jackson, the rate will be governed by the Wenona rate, with twelve dollars per car added from point of shipment. For instance, our present rate, Wenona to Detroit is twenty-five dollars, and twelve dollars added would make the rate thirty-seven dollars from point of shipment to Detroit, or forty-two dollars to Toledo, fifty-two dollars to Chicago, seventy-two dollars to Cincinnati, forty-eight dollars to Fort Wayne.

If you conclude to build on the line of the road, we will give you the benefit of the lowest possible rate at all times.

Believing the same will prove satisfactory, I remain,

Yours truly,
M. NORTHRUP,
*General Freight Agent.*

---

May 2, 1872.

*Mr. Northrup,*

DEAR SIR:—I called to-day, and have had a talk (not decisive) with Mr. Watson, in relation to your letter to Edwards & Sanborn.

They wish me to build a mill on their land at twenty-one north, two east. I wanted in their behalf assurance of the time for which the terms you can give them should last. I spoke to him, as he will tell you, for terms on lots leaving the mill, unloading at East Saginaw for being planed, then re-loaded over your road for the east, asking if the twelve dollar rate should hold good on it.

I want to know how much encouragement you will hold out to me in the matter of getting my material on the lot to build

and furnish it to the railroad company for carriage, the company would carry and deliver it at Wenona for sixteen dollars a car. The mill was built, the lumber furnished, and the carriage entered upon, and for a time performed at the agreed price, and then delivery was refused except on payment of twenty-two dollars a car. To get his lumber, plaintiff paid under protest, and asks that the excess of six dollars a car be paid back to him. This statement by counsel for the defendant in error affords an explanation of the case he claims the evidence tended to establish.

The positions taken by counsel for the plaintiff in error will appear by recurring to their requests to charge. They requested, and the court refused to charge, that there was

---

a good mill, taking it either from East Saginaw or Bay City. Will you please write me immediately? If I go into the operation, I shall have a mill of about one hundred and fifty thousand a week, the year round for ten years.

I rely upon your doing the best for me you can to get my machinery and material on the ground for a start. Your answer as to the matters mentioned will influence my decision largely.

Yours truly,
GEO. W. HOTCHKISS,
East Saginaw.

---

May 4, 1872.

*Geo. W. Hotchkiss, Esq., East Saginaw,*

DEAR SIR:—Yours of the second is at hand, referring to the same, my note to Edwards & Sanborn of the 5th April. *There will be no increase in the Wenona and Saginaw rates; if any, there will be a reduction on these points.* The through rates are liable to change from Wenona. *The twelve dollar rate would remain the same at all times.* The twelve dollar rate would not apply to shipments to be unloaded, planed, and re-shipped. However, if there is much of this kind of business to be done, I see no objection to making a liberal reduction in the twenty dollar rate to East Saginaw, if transfer is promptly made. Any machinery that you wish to send up for the purpose of building a mill, we will take at lumber rates, say from East Saginaw to mill twenty dollars. From Wenona to mill sixteen dollars. Believing the same will prove satisfactory, I remain,

Yours truly,
M. NORTHRUP.

P. S.—If you conclude to ship the machinery, please advise us, and I will arrange as above.

Yours,—M. N.

no evidence to authorize a recovery; that the letters, either in conjunction with the oral matter or by themselves, did not constitute a contract; that if the evidence went to show an agreement partly in writing and partly not, and not to be performed within a year, it was not binding; that if it should be found that there was a written proposition to perform services to extend beyond a year, the acceptance, unless in writing, would not be of force to make the proposition obligatory; that the evidence did not show that Northrup had authority from the company to make the contract claimed to have been made; and finally, that no recovery could be had for the money paid as freight, unless it should be found from the evidence that it was wrongfully demanded by the company whilst holding the lumber, and that a delivery of the lumber was refused except upon the payment. And in support of the first request the specific point is now made and strongly pressed, that if the bargain alleged was in fact made, it was repugnant to public policy and void on account of its discriminating operation.

Passing by the question of authority in the company's agent to make the supposed contract, and passing the points respecting the application and operation of the statute of frauds, and the point based on public policy, and waiving, moreover, the facts that defendant in error proceeded to consummate the arrangement with Hotchkiss; that the mill was built pursuant to that arrangement; that, as contemplated, lumber was manufactured and delivered to the company for carriage; that several car loads were actually carried for sixteen dollars per car, and that the company compelled the defendant in error to pay twenty-two dollars per car load for all carried afterwards,—there is still a question remaining which goes to the essence of the case. If it were admitted that the company promised to carry as alleged, the most that could be claimed on the other side, to establish any accession thereto, would be that the defendant in error subsequently acted on it. This would follow, because it is very plain that there was no evidence, either written or

oral, of any express acceptance.    But the evidence, it is true, did show that the arrangement between Edwards and Hotchkiss was entered into; that the mill was built; that lumber was manufactured and furnished to the company for carriage, and that a large quantity was actually carried.

Before these facts, however, can be allowed to operate as an implied or virtual acceptance of a previous promise on the part of the company, there must be evidence tending to show the existence of the supposed promise.    For it cannot be held that particular acts were done or based upon a promise unless there was such a promise, and here I think the case fails.    The verbal evidence had no tendency to show such a promise by the company.    Had the letters any? This depends upon the construction due to them in view of the circumstances.    On reading them in the light shed by the surrounding facts, it is not perceived that they had. Edwards and Sanborn of the one part, and Hotchkiss of the other, were talking about embarking in the enterprise we have mentioned.    If they went into it they would have, for two or three years at least, large quantities of lumber to be carried away, and they naturally deemed it important to get information in regard to the cost of carriage.    Moreover, they were no doubt solicitous to get assurance that if the rates ascertained were answerable to the character of their project they should not go higher.

They proceeded to call on the company agents to find out what rates could be obtained in case the mill should be built and operated.    In doing this they were not minded to bind, and did not assume to bind themselves to the company in any way that the suggested agreement with Hotchkiss should be entered into and carried out, or that any lumber should positively be provided to be carried by the company, or that they would not embrace any other means which might offer to do their transporting business.    Nothing of this kind was within the scope of their plan.    The most that they sought was to find out what rates could be obtained, and if found admissible, then, without binding

themselves to any thing towards the company, to get as high an assurance as practicable that such rates should not be altered to their disadvantage.

The agent of the company informed them of the then existing rates, and expressed a spirit of accommodation. But when pressed for assurance that the rates should not be made more onerous for the next two or three years, Mr. Northrup did not assume to promise on behalf of the company that no such change should in fact be made. He did, however, express a very decided opinion that no change detrimental to defendant in error would be made. Upon this he was very positive. Still he refrained, as before stated, from any promise that the rates should be immutable. The nature of his assurance stopped short of that. He believed that if any change should happen it would consist in a reduction rather than an advance of rates, and stated his belief very positively, and he observed that if it was concluded to build the mill on the line of the road the lowest possible rates would be applied. The facts indicate that he expected to remain in charge, and to have it in his own power and discretion to regulate such matters as they should occur. And this fact helps to explain somewhat the tone of his letters. He had in his own mind a line of future policy, and which he no doubt expected to pursue; and although not assuming to bind the company by a continuing promise, he was impressed with the idea that by means of his position the respective future shipments by defendant in error would be subject to his policy, and amenable to his expressed opinion as to rates in the future. This, it appears to me, is a fair exposition of Mr. Northrup's doings. In a matter of so much importance as a promise to bind his company for a term of years for the carriage at a fixed rate of many millions of feet of lumber, and without any obligation whatever on the other side, it would have been very singular if he had left the undertaking to be deduced from general and vague expressions in two or three letters. Before making such a stipulation he must, if satisfied he had any power

to make it, have bestowed some thought upon the bearing it would be likely to have on the interests of the company, and his agreement must have shown some care and deliberation. On the other hand, it is very difficult to suppose that if the minds of the parties had met upon such a one-sided promise as that claimed to have been made by the company,—a promise fraught with so much moment,—Mr. Edwards would have been satisfied with any thing so loose, indefinite and informal as these letters. On the whole, I think there was no evidence tending to prove the promise relied on, and that the court ought to have charged accordingly, as requested.

The judgment should be reversed, with costs, and a new trial ordered.

The other Justices concurred.